MICHAEL JAY GREEN       4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347
Email: michael@michaeljaygreen.com

GLENN H. UESUGI       4865
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521-3336
Fax: (808) 566-0347
Email: glenn.uesugi@gmail.com

Attorneys for Plaintiff
SUSANA R. CASAQUIT

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | | |
|---|---|---|
| SUSANA R. CASAQUIT, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | COMPLAINT; DEMAND FOR |
| | ) | JURY TRIAL |
| vs. | ) | |
| | ) | |
| HAWAII MEDICAL SERVICE | ) | |
| ASSOCIATION; AND DOE | ) | |
| DEFENDANTS 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **COMPLAINT**

COMES NOW, Plaintiff SUSANA R. CASAQUIT (hereinafter "Plaintiff

CASAQUIT"), by and through her attorneys, Michael Jay Green and Glenn H.

Uesugi, and for Complaint against Defendants HAWAII MEDICAL SERVICE

ASSOCIATION (hereinafter "Defendant HMSA"); AND DOE DEFENDANTS 1-

100, alleges and avers as follows:

## **PARTIES**

1.     Plaintiff CASAQUIT  is a resident of the County of Honolulu, State

of Hawaii.

2.     Defendant HMSA is and was at all times relevant herein an entity

doing business in the County of Honolulu, State of Hawaii.

3.     The employees, agents, associates, and/or representatives of

Defendant HMSA and others who held themselves out as being employees, agents,

associates, and/or representatives of Defendant HMSA were acting within the

scope of such relationship. Defendant HMSA is therefore liable for all of the acts

and/or omissions of its employees, agents and/or putative employees under the

doctrine of respondeat superior, or are otherwise vicariously liable for their acts

and omissions under principal/agent or master/servant principles.

4.     The employees, agents, associates, and/or representatives of

Defendant HMSA were acting under the actual and/or apparent authority and/or

agency of Defendant HMSA. Therefore, Defendant HMSA is liable for all acts

and/or omissions of the employees, agents, associates, and/or representatives of

Defendant HMSA under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency, or is otherwise vicariously liable for its acts and omissions under the theory of apparent authority/agency.

5.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOE DEFENDANTS 1-100 and therefore sue said Defendants by such fictitious names.  Plaintiffs will amend their Complaint to allege their true names and thereon allege that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages, as herein alleged, were proximately caused by their conduct.  Plaintiff has made good faith and diligent efforts to identify said Defendants, including interviewing individuals with knowledge of the claims herein.  Plaintiff is informed and believe and therefore allege that at all times herein mentioned, Defendants, and each of them, were the agents, servants and employees of each of the other Defendants herein, and were acting with the permission and consent and within the course and scope of said agency and employment.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter and parties

pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

7.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiff seeks damages for violation of her civil rights.

8.      This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy.

9.      Plaintiff's state law claims share all common operative facts with the federal law claims, and the parties are identical.

10.     Venue is proper in, and Defendants are subject to the personal jurisdiction of, thisCourt because Defendants maintain facilities and business operations in this District, and all ormost of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

**FACTS (EEOC #1)**

11.     On November 14, 1994, Plaintiff CASAQUIT began her employment with Defendant HMSA  as an HMO (Health Medical Organization) Provider Representative, Grade 9.

12.     The manager of Provider Services Field Representative Unit was Mr. Carl Omori.

13.     Plaintiff CASAQUIT'S job responsibilities included:

        a.      Developing and maintaining a positive working relationship between the HMO providers and HMSA as needed to maintain provider participation

        b.      Ensure compliance with all HMSA policies and programs that will directly benefit and enhance the general membership of HMSA

        c.      Duties performed under minimal supervision.

14.    Plaintiff CASAQUIT'S essential duties and functions were:

        a.      Responsibility for meeting with providers to explain, negotiate and secure multiple HMSA participating agreements that will directly benefit HMSA's general membership;

        b.      Successful negotiations in securing signed agreements that will reduce health care costs for HMSA members and allow for competitive health pricing.

        c.      Conduct field visits to providers in assigned areas at an appropriate frequency as assigned.

        d.      Field visits shall be comprehensive in nature with emphasis on personal contact with key providers and addressing issues concerns of mutual benefits to providers and HMSA.

        e.      Act as an advocate for provider issues within HMSA.

f.    Educate and ensure that eligible providers understand and comply with all HMSA plans, policies, participating agreements and managed care requirements.

g.    Enlist non-participating provider's compliance with claims filing and managed care requirements.

h.    Meet with providers and/or their office staff, billing consultants and vendors to evaluate, educate and assist them with proper claims filing procedures to ensure accurate and efficient claims processing in accord with HMSA's policies, member plan certificates and provider agreements.

i.    Maintain knowledge and active relationship with other internal departments to ensure HMSA compliance with all provider agreements.

j.    Possess fundamental understanding and initiate offering of other HMSA services and products (including but not limited to Electronic Data Information, Hawaii Health Insurance Network and Provider Info System) that will reduce administrative costs, enhance and strengthen provider relationship and loyalty with HMSA.

15.    Plaintiff CASAQUIT'S key strength coming in to HMSA was customer/professional and public relations.

16.    When Plaintiff CASAQUIT was given the opportunity to work for

the department in dealing with the Providers, Doctors and Facilities, she was told that they would review her salary after three months of probation.

17.     After the three months probationary period, Plaintiff CASAQUIT received a 3% increase in pay.

18.     The 3% pay increase was extraordinary and not normal procedure for Defendant HMSA.

19.     In January 1996, Plaintiff CASAQUIT was promoted to Dental Field Coordinator/Supervisor, Grade 12 by Manager Aaron Kimura.

20.     The job description for the HMSA Dental Field Coordinator/Supervisor position was substantially similar to the Field Representative position with the exception for being the Supervisor for the Field Dental Unit with more responsibility in managing staff and the Dental Network.

21.     In March 2007, the Dental Field Unit employees were notified that HMSA would be turning over the Dental Network/Contracting and Servicing to Life Specialty Ventures (LSV) and that the current HMSA Dental Field employees will be moving over as an employee of this new company.

22.     The Vice President of the Provider Services Department requested to meet with Plaintiff CASAQUIT.

23.     During their meeting the Vice President of the Provider Services

Department asked Plaintiff CASAQUIT to consider staying with HMSA.

24.    The Vice President of the Provider Services Department stated he would offer Plaintiff CASAQUIT a position like what she currently had in the Dental Unit.

25.    There was a position for Field Service Coordinator that Plaintiff CASAQUIT was going to be offered.

26.    However, the manager of Contracting and Facility Relations, Mr. Richard Momono, met with Plaintiff CASAQUIT and asked if she would consider applying for the job opening in his department.

27.    The position that Mr. Momono was referring to in his department was Senior Contracting and Facility Relations Consultant, Grade 13.

28.    Plaintiff CASAQUIT was very interested in  Senior Contracting and Facility Relations Consultant, Grade 13 position.

29.    Plaintiff CASAQUIT applied for Senior Contracting and Facility Relations Consultant, Grade 13 position.

30.    In March 2007, Plaintiff CASAQUIT was hired by HMSA for the Senior Contracting and Facility Relations Consultant, Grade 13 position.

31.    The Senior Contracting and Facility Relations Consultant, Grade 13 position Job Summary is as follows: :

a.      Responsible for preparing, examining, analyzing, negotiating and revising facility and provider contracts.

b.      Serve as the point of contact for facilities and providers, primarily focusing on contractual matters and facilitating resolution for other provider matters in accordance to corporate strategy.

c.      Act as a liaison between HMSA employees and providers, ensuring accurate contracting and timely review and approval/reconciliation of variations for other provider matters.

d.      Build and maintain positive relationships with facilities and providers through site visits, written and telephonic communications.

32.      The primary duties and responsibilities for the Senior Contracting and Facility Relations Consultant, Grade 13 position are:

a.      On all standard and nonstandard contracts, provide redlined recommendations and often negotiate directly with customer attorneys or staff until consensus has been reached.

b.      Analyze and review contract language to ensure accuracy and consistency with negotiated terms and HMSA policies, procedures and system requirements.

c.      Work with Legal, Business Integrity, Credentialing and

Finance to coordinate contractual agreements.

      d.     Coordination with other HMSA Departments to ensure appropriate implantation and administration of facility contracts.  This may include, but is not limited to working with Finance to ensure adherence to broader finance and risk managements such as revenue recognition, pricing and discounting policies, export controls, etc.  May include "financial" engineering and understanding/evaluating economic impact of terms and term options.

      e.     Identification and coordination among external and internal stakeholders for resolving facility provider issues.  Maintain contractual records and documentation such as receipt and control of contract correspondence, customer contact information, contractual changes, status reports and other documents for all projects.  Ensure that signed contracts are communicated to all relevant parties to comply with contract terms.  Ensure contract close-out, extension or renewal.

      f.     Relations development and facilitate strategic contracting. Develop and maintain positive working relationships between facility providers and HMSA.  Monitor customer satisfaction with HMSA's terms and conditions and contracting practices.  Recommend changes and contracting strategies to reduce contractual risk and maximize company savings.  Support Product

Management/Marketing to ensure company products and services are offered with appropriate, strategic, and competitive terms.

g.      Develop and implement procedures for contract management and administration in compliance with company policy.  As appropriate, contribute to or influence company policies.

h.      Develop and prepare regular reports on the status of contracts and negotiations based on detailed analysis.  Handle on-going provider issues and change management.

i.      As needed, provide guidance on contract matters to supervisors or other operational staff, including training to new project stakeholders and other employees in contracting practices and procedures.

j.      Perform other duties as assigned.

33.      Plaintiff's key assigned Facilities and Hospitals for the Senior Contracting and Facility Relations Consultant, Grade 13 position were:

a.      Queens Health Care Systems (Queen's Medical Center, Punchbowl and West Oahu, North Hawaii Community Hospital, Molokai General Hospital);

b.      Hawaii Health Systems Corporation (Leahi Hospital, Kauai Veterans Memorial Hospital, Hilo Medical Center, Kona Hospital, Hale Ho'ola

Hamakua, Lanai Community Hospital, Kau Hospital and Kahuku Hospital);

      c.     Ohana Pacific Management (Ann Pearl Healthcare, The Villas at Liliha Kupuna, Garden Isle Rehab and Healthcare, Hale Kupuna, Kauai Adult Day Care, Pu'uwai O Makaha, Stay at Home Healthcare Services;

      d.     Ito Healthcare (Pearl City Nursing Home, Kulana Malama, Kokua Nurses, Malama Adult Day Care);

      e.     Diagnostic Laboratory Services;

      f.     Clinical Laboratory of Hawaii;

    34.     Between 2007 - 2017, there were several changes in Contracting and Facility Relations management to whom Plaintiff CASAQUIT reported to:

      a.     Mr. James Walsh, VP of Provider Services (retired 2014)

      b.     Mr. Richard Momono (left to work for Queen's Medical Center 2015)

      c.     Ms. Katie Akimoto, Assistant VP, Provider Services (she was acting Manger while she searched for a new manager)

      d.     Ms. Rachel Los (left the company 2016)

      e.     Ms. Lois Li (left company to start her own business 2017)

    35.     On April 16, 2016, Plaintiff CASAQUIT was seen by Dr. Michael Mihara, her Primary Care Physician, for morning stiffness of joints that she was

encountering.

36.     After several visits, and an evaluation based on laboratory test results, Dr. Mihara referred Plaintiff CASAQUIT to Dr. Deryll Ambrosio, a Rheumatologist.

37.     On May 10, 2016, Plaintiff CASAQUIT was diagnosed with Rheumatoid Arthritis by Dr. Deryll Ambrosio.

38.     Rheumatoid arthritis is a chronic inflammatory disorder that can affect more than just a person's joints.

39.     In some people, the condition also can damage a wide variety of body systems, including the skin, eyes, lungs, heart and blood vessels.

40.     An autoimmune disorder, rheumatoid arthritis occurs when the person's immune system mistakenly attacks their own body's tissues.

41.     Unlike the wear-and-tear damage of osteoarthritis, rheumatoid arthritis affects the lining of your joints, causing a painful swelling that can eventually result in bone erosion and joint deformity.

42.     The inflammation associated with rheumatoid arthritis is what can damage other parts of the body as well.

43.     While new types of medications have improved treatment options dramatically, severe rheumatoid arthritis can still cause physical disabilities.

44.    Signs and symptoms of rheumatoid arthritis may include:

     a.    Tender, warm, swollen joints;

     b.    Joint stiffness that is usually worse in the mornings and after inactivity;

     c.    Fatigue, fever and weight loss.

45.    Early rheumatoid arthritis tends to affect a person's smaller joints first - particularly the joints that attach the fingers to the hands and toes to the feet.

46.    As the disease progresses, symptoms often spread to the wrists, knees, ankles, elbows, hips and shoulders.

47.    In most cases, symptoms occur in the same joints on both sides of one's body.

48.    About 40 percent of the people who have rheumatoid arthritis also experience signs and symptoms that don't involve the joints.

49.    Rheumatoid arthritis can affect many non-joint structures, including:

     a.    Skin;

     b.    Eyes;

     c.    Lungs;

     d.    Heart;

    e.       Kidneys;

    f.       Salivary glands;

    g.       Nerve tissue;

    h.       Bone marrow; and

    i.       Blood vessels.

50.    Rheumatoid arthritis signs and symptoms may vary in severity and may even come and go.

51.    Periods of increased disease activity, called flares, alternate with periods of relative remission - when the swelling and pain fade or disappear.

52.    Over time, rheumatoid arthritis can cause joints to deform and shift out of place.

53.    Plaintiff CASAQUIT would have flare ups occasionally, which included fatigue, fever and joint problems, difficulty sitting and getting up and walking.

54.    Plaintiff CASAQUIT and other HMSA employees could work from home if approved by the employee's immediate Manager.

55.    Plaintiff CASAQUIT'S  manager Raquel Los and Lois Li approved Plaintiff CASAQUIT for working from home if Plaintiff CASAQUIT could still do her computer and telephonic work.

56.     If not, Plaintiff CASAQUIT would be required to request to take a sick leave.

57.     Plaintiff CASAQUIT'S average sick days taken was about two to three days per month.

58.     On May 2016 through May 2017, a completed Family Medical Leave of Absence form WH-380-E was completed by Dr. Deryll Ambrosio for the period of May 10, 2016 through May 20, 2017.

59.     This form was later renewed from May 2017 through May 20, 2018.

60.     On April 29, 2016, Plaintiff CASAQUIT saw Dr. Michael Mihara for chronic nasal congestion in which he referred me to Ear, Nose & Throat (ENT) Specialist, Dr. James Lee.

61.     Plaintiff CASAQUIT was treated by Dr. James Lee for sinus infections and chronic nasal congestions for a period of about 12 months.

62.     Dr. James Lee decided to do a CT Scan on May 22, 2017 of Plaintiff CASAQUIT'S sinus area.

63.     Dr. James Lee requested the CT scan to ensure that Plaintiff CASAQUIT'S sinus cavity was clear.

64.     During  this process, a tumor was found in Plaintiff CASAQUIT'S brain which attached onto the Pituitary Gland.

65.     An MRI was performed on June 4, 2017, which confirmed that Plaintiff CASAQUIT had a 6mm Non-functioning Pituitary Gland Adenoma tumor.

66.     On June 7, 2017, Plaintiff CASAQUIT was referred to a Neuro Surgeon Specialist, Dr. Eric Oshiro.

67.     An MRI was performed, which confirmed that Plaintiff CASAQUIT had a 6mm Non-functioning Pituitary Gland Adenoma tumor. .

68.     The pituitary gland is a pea-sized gland at the base of a person's brain.

69.     The pituitary is the "master control gland" - it makes hormones that affect growth and the functions of other glands in the body.

70.     With pituitary disorders, a person often has too much or too little of one of the hormones in the body.

71.     Injuries can cause pituitary disorders, but the most common cause is a pituitary tumor.

72.     Pituitary tumors are abnormal growths in the pituitary gland.

73.     Such tumors are almost always benign (not cancerous) but can cause hormonal imbalances and interfere with the normal function of the pituitary gland.

74.     There are two types of pituitary tumors: secretory (which make

hormones) and non-secretory (which don't make hormones).

75.    Secretory tumors can cause various problems depending on the hormone that the tumor produces.

76.    Non-secretory tumors, if they become large, can cause problems by pressing against the pituitary gland or the brain.

77.    This pressure can interfere with normal pituitary function. Tumors less than 1 centimeter (cm) in size are called microadenomas, which rarely cause problems.

78.    Macroadenomas (1 cm or larger) are more likely to press on the pituitary or nearby structures.

79.    Symptoms of pituitary tumors vary depending on whether they are caused by the tumor mass or hormonal changes (either too much or too little hormone).

80.    The symptoms also vary from person to person.

81.    The list of possible symptoms is long.

82.    Symptoms of tumor mass pressure can include headaches and trouble seeing, especially problems with peripheral vision.

83.    Symptoms of low pituitary hormones include fatigue, dizziness, dry skin, irregular periods in women, and sexual dysfunction in men.

84.     Other symptoms depend on the hormone that is affected. ACTH-producing tumors can cause Cushing's disease.

85.     Growth hormone-producing tumors can cause acromegaly.

86.     Prolactin-producing tumors can cause irregular or absent menstrual periods in women.

87.     They can also cause a woman's breasts to make milk, even if she's not pregnant.

88.     In men, these tumors can cause sexual dysfunction and breast enlargement.

89.     These conditions can have serious health risks.

90.     Treatment of pituitary tumors depends on the type of tumor, how large it is, what symptoms it is causing, and the patient's age and overall health.

91.     On July 14, 2017, Plaintiff CASAQUIT met with Ms. Jayme Puu at the Kapolei office.

92.     Plaintiff CASAQUIT informed Ms. Puu of her current finding of tumor in the Pituitary Gland discovered through CT scan on May 2017.

93.     On August 2018, Mr. Greg Schlais was hired as a Director of Facility and Contracting Unit.

94.     Mr. Schlais assumed the manager duties of Plaintiff CASAQUIT'S

department temporarily until a new one was hired.

95.   The HMSA building went under renovations.

96.   Each floor had scheduled to go through construction schedules in which departments needed to be moved out.

97.   When Plaintiff CASAQUIT'S department was next to move, Ms. Puu, VP of PS Operations asked for volunteers to move to the Kapolei building.

98.   There was a total of 5 staff that lived on the West side of Oahu (hereinafter "Westside") who volunteered.

99.   Working in the Kapolei office was very convenient, daily commute time of 10-15 minutes to work versus one hour or more commute to town.

100.   Ms. Puu lived on the same area (Westside) also appreciated that she could work in this office occasionally (at least once or twice a week).

101.   Ms. Puu showed a lot of compassion to those who lived on the Westside.

102.   Plaintiff CASAQUIT worked at the Kapolei office until the new Provider Service floor completed its renovation.

103.   Sometime in September 2017, HMSA decided to rent out two and a half floors from the 1601 Kapiolani Boulevard office building.

104.   With this decision, Provider Services Department was one of the

departments that was chosen to be re-located in this building.

105.   Ms. Puu requested that all the Provider Services Department staff be moved into this office space.

106.   Kapolei staff were included in the move.

101.   In October 2017, the Kapolei staff was permanently moved full time at the 1601 Kapiolani office building.

107.   In December 7, 2017, Mr. Greg Schlais, Director of Provider Services and Jayme Puu, VP of Provider Services, called a meeting with the three Senior Facility and Contracting Consultants:

   a.   Rose Oishi (30 years of service)

   b.   Susana Casaquit (23 years of service)

   c.   Kathleen Locke (2 years of service)

108.   All three were notified that their jobs have been eliminated.

109.   A memorandum dated December 7, 2017 was presented to all three stating the same.

110.   All three employees, including but not limited to Plaintiff CASAQUIT, were told that they would be given the first chance to apply for the newly created positions before they posted the positions outside of the Facility and Relations Unit.

- 21 -

111.   The three Senior Facility and Contracting Consultants all applied for the same newly created job positions of a Provider Contracting Manager and Facility Relations and Contracts Coordinator.

112.   The Job Description that was presented to the three of us only indicated Physical Demands:

a.   Definition of Physical abilities necessary to perform the essential function of the job:

i.   Frequent: sitting, finger dexterity, seeing, hearing, speaking;

ii.   Occasional:  standing, walking, reaching at and below should level, ascending/descending stairs, stopping/bending/kneeling;

iii.   As needed:  squatting, pushing/pulling; carrying light objects; reaching above shoulder level;

iv.   Typically operates computer, typewriter; calculator, copier, facsimile and telephone.

113.   On December 10, 2017, Plaintiff CASAQUIT sent her application for the Provider Contracting Manager position to Kelly Fritz, Human Resources Provider Services Recruiter.

114.   On December 12, 2017, Greg Schlais, Manager sent email

acknowledging receipt of the applications from the three applicants.

115.   On December 18, 2017, Plaintiff CASAQUIT met with Mr. Schlais to interview for the position she applied for.

116.   On January 4, 2018, Mr. Schlais met with the three candidates individually.

117.   Mr. Schalais met with and informed Ms. Rose Oishi that she was hired for the Provider Relations Manager position.

118.   Mr. Schalais met with and informed Ms. Kathleen Locke that she was hired for the Facility and Contracting Coordinator position.

119.   Mr. Schalais met with and informed Plaintiff CASAQUIT she was not chosen for the position that she applied for.

120.   Mr. Schalais did not give Plaintiff CASAQUIT a specific reason why Plaintiff CASAQUIT was not chosen.

121.   Instead, Mr. Schlais just kept apologizing to Plaintiff CASAQUIT and saying sorry.

122.   Plaintiff CASAQUIT was not told she was not qualified for the position by Mr. Schlais.

123.   Plaintiff CASAQUIT was not chosen for the position due to her medical condition and perceived disability by Defendant HMSA.

124. Defendant HMSA waited until December 2017 to announce the elimination of Plaintiff CASAQUIT'S position to avoid civil liability and responsibility for their termination of Plaintiff CASAQUIT.

125. Defendant HMSA knew or should have know that Plaintiff CASAQUIT was highly qualified for the position that the declined to hire her for.

126. Plaintiff CASAQUIT'S last day of work for Defendant HMSA as indicated by the December 7, 2017 memorandum was March 1, 2018.

127. On January 31, 2018, Plaintiff CASAQUIT viewed the HMSA.com employment/job website and found the Job Description for the same position she applied for.

128. In the job description document online, the Physical Demands/Requirements was not stated.

129. The physical demands/requirement that had been placed in the job description earlier was designed to specifically target Plaintiff CASAQUIT to give Defendant HMSA reasons not to hire her.

130. Once Plaintiff CASAQUIT left Defendant HMSA'S employment, Defendant HMSA no longer had any reason to place the physical demand/requirements in the job description.

131. In the 23 years of employment with HMSA, Plaintiff CASAQUIT

only had positive annual reviews given to her by her managers which were approved by the Vice Presidents in charge of her department.

132.   On January 17, 2018, Plaintiff CASAQUIT was admitted to Queen's Medical Center West Oahu Emergency Department.

133.   Plaintiff CASAQUIT went to the emergency room for low blood pressure, hypotension and pituitary adenoma.

134.   Plaintiff CASAQUIT felt very weak, had difficulty breathing and experienced cold chills.

135.   Plaintiff CASAQUIT was subsequently release from the emergency room after over 24 hours of monitoring and treatment.

136.   Plaintiff CASAQUIT was out on sick leave for this condition until February 5, 2018, when she returned to work.

137.   On January 25, 2018, a meeting with Janice Quiban, HR representative was requested by Plaintiff CASAQUIT.

138.   Plaintiff CASAQUIT was presented with a memo describing an overview of her retirement benefits.

139.   Ms. Quibane informed Plaintiff CASAQUIT that she was considered a retiree with HMSA due to her 23.3 years of service and her age of termination.

140.   On March 1, 2018, Plaintiff CASAQUIT met with Janice Quiban for my final exit to turn in her company and parking badges, to receive her last pay check and to confirm the retirement document's due date for submission.

141.   Sometime in May 2018, Plaintiff CASAQUIT spoke with Rose Oishi who informed her that after Plaintiff CASAQUIT departed from HMSA, a new male person was hired from the mainland for the Provider Network Manager position.

142.   Later, Plaintiff CASAQUIT again spoke with Rose Oishi who informed her that another position was opened for Provider Network Manager and that another male applicant was hired.

143.   In committing the above acts and omissions, Defendants acted wantonly and/or oppressively and/or with such malice as implies a spirit of mischief or criminal indifference to civil obligations and/or there has been some wilful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive damages in an amount to be proven at trial.

144.   Plaintiff was given a Notice of Right to Sue letter from the EEOC relating to this case dated June 4, 2019.

145.   This lawsuit was timely filed within the time frame outlined in the

June 4, 2019 Notice of Right to Sue letter from the EEOC and/or agreement of the

parties.

## COUNT I: VIOLATION OF THE
## AMERICANS WITH DISABILITIES ACT OF 1990 (EEOC #1)

146.   Plaintiff realleges and incorporates by reference paragraphs 1

through 145  as if said paragraphs were fully set forth herein.

147.   The above acts by Defendants with respect to Plaintiff constituted a

violation of the Americans with Disabilities Act of 1990, as amended.

148.   As a result of the aforementioned wrongful, unlawful, and illegal

acts and/or omissions of Defendants as alleged herein, Plaintiff suffered special

and general damages in an amount to be proven at trial.

## COUNT II: VIOLATION OF
## HAWAII  REVISED STATUTES SECTION 378-2 (EEOC #1)

149.   Plaintiff realleges and incorporates by reference paragraphs 1

through 148  as if said paragraphs were fully set forth herein.

150.   The above acts by Defendants with respect to Plaintiff constituted a

violation of Hawaii Revised Statutes Section 378-2.

151.   As a result of the aforementioned wrongful, unlawful, and illegal

acts and/or omissions of Defendants as alleged herein, Plaintiff suffered special

and general damages in an amount to be proven at trial.

### FACTS (EEOC #2)

152.   Plaintiff realleges and incorporates by reference paragraphs 1 through 151  as if said paragraphs were fully set forth herein.

153.   Plaintiff CASAQUIT filed an earlier EEOC charge against HMSA on August 28, 2018, Charge Number: 846-2018-09019, Sec 83 Number: A19-10-Sec83-0260-LA, Case Name: Susana Casaquit v. HMSA.

154.   Plaintiff CASAQUIT was given a  Right to Sue letter from the EEOC relating to this earlier case which was dated June 4, 2019.

155.   Plaintiff filed suit in Susana Casaquit vs. Hawaii Medical Service Association, et.al., Case No. 19-1-1384-08 JHA, In the Circuit Court of the First Circuit, State of Hawaii on August 29, 2019 (hereinafter "EEOC #1").

156.   On August 20, 2020, Plaintiff CASAQUIT received a text from her Girlfriend who works for Defendant HMSA asking if Plaintiff CASAQUIT would be interested in a temporary contractor job for HMSA in her department.

157.   Debby Yokomizo is the hiring manager for Defendant HMSA.

158.   The project length was approximately 3 months and would entail data entry into their contract database which would require some contract review.

159.   Plaintiff CASAQUIT responded to her girlfriend stating that it sounded good and that Plaintiff CASAQUIT would like to get back into the work

mode.

160.   Plaintiff CASAQUIT asked her girlfriend if she presented this to her manager Debby.

161.   Plaintiff CASAQUIT'S girlfriend responded by stating she did, and that Debby Yokomizo actually thought of Plaintiff CASAQUIT and asked to reach out to Plaintiff CASAQUIT if Plaintiff CASAQUIT would be interested.

162.   Plaintiff CASAQUIT'S girlfriend did say that they have started interviewing candidates from agencies and that she did not want Plaintiff CASAQUIT to get her hopes up, but that Plaintiff CASAQUIT had the experience and have a leg up on them.

163.   Plaintiff CASAQUIT'S girlfriend explained that Defendant HMSA had a hiring freeze so this job/position was not posted on their website.

164.   Plaintiff CASAQUIT was asked that if she was interested, she would need to go through the hiring agency (TEKSystems).

165.   Plaintiff CASAQUIT sent her Resume and worked with Dasa Harrell from TEKSystems on August 24, 2020.

166.   On August 24, 2020, at 1:56pm, Plaintiff CASAQUIT received an email from Dasa stating the following:

Hi Susana, Thank you for reaching out!  Please see a

short job description below.

Project/work supporting: HMSA CVM department has launched ServiceNow and started using the tool about 1.5 years ago, but they're reconfiguring and relaunching the processes and workflow; this person would be responsible for contract data cleanup. They would be on daily basis ensuring the contracts term dates are valid and ensuring accuracy of the data. They will then be loading the data into ServiceNow.

   1. Critical thinking skills and detail oriented mentality
   2. Vendor management and procurement experience would be helpful; service now experience would be super helpful
   3. Excellent communication skill are required as this person will need to reach out for help when needed and be able to communicate to staff in CVM department.

Hope this helps!  Let me know if you have any questions.
Warm regards,
Dasa

167.   On August 24, 2020 at 7:48 pm, Plaintiff CASAQUIT received the

following email from Dasa:

Hi Susana,

Thank you for getting your resume over to me so fast! I spoke to Debby this afternoon and since she already interviewed other candidates for the role and is urgent on filling it asap, she decided to pass for the time being.

> If anything changes I'll be sure to reach out right
> away.
>
> Stay safe!
> Dasa

168.   Plaintiff CASAQUIT was never contacted again by either HMSA or

Dasa.

170.   In addition to the reasons stated above (Facts, EEOC #1), Plaintiff

CASAQUIT stopped being a candidate for the position with HMSA in August

2020 in retaliation for Plaintiff CASAQUIT pursuing relief with the EEOC and

filing suit against Defendant HMSA for employment discrimination in <u>Susana</u>

<u>Casaquit vs. Hawaii Medical Service Association, et.al.</u>, Case No. 19-1-1384-08

JHA, In the Circuit Court of the First Circuit, State of Hawaii. (hereinafter "EEOC

#1")

171.   <u>Susana Casaquit vs. Hawaii Medical Service Association, et.al.</u>,

Case No. 19-1-1384-08 JHA, In the Circuit Court of the First Circuit, State of

Hawaii on August 29, 2019 was still active during August 2020 when Plaintiff

CASAQUIT applied for the position described above.

172.   In committing the above acts and omissions, Defendants acted

wantonly and/or oppressively and/or with such malice as implies a spirit of

mischief or criminal indifference to civil obligations and/or there has been some wilful misconduct that demonstrates that entire want of care which would raise the presumption of a conscious indifference to consequences, justifying an award of punitive damages in an amount to be proven at trial.

173.   Plaintiff was given a Notice of Right to Sue letter from the EEOC relating to this case (EEOC #2) dated March 22, 2022.

174.   This lawsuit was timely filed within the time frame outlined in the March 22, 2022 Notice of Right to Sue letter from the EEOC.

## COUNT III: VIOLATION OF THE
## AMERICANS WITH DISABILITIES ACT OF 1990 (EEOC #2)

175.   Plaintiff realleges and incorporates by reference paragraphs 1 through 174  as if said paragraphs were fully set forth herein.

176.   The above acts by Defendants with respect to Plaintiff constituted a violation of the Americans with Disabilities Act of 1990, as amended.

177.   As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered special and general damages in an amount to be proven at trial.

## COUNT IV: VIOLATION OF
## HAWAII REVISED STATUTES SECTION 378-2 (EEOC #2)

178.   Plaintiff realleges and incorporates by reference paragraphs 1

through 177  as if said paragraphs were fully set forth herein.

179.   The above acts by Defendants with respect to Plaintiff constituted a violation of Hawaii Revised Statutes Section 378-2.

180.   As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered special and general damages in an amount to be proven at trial.

## COUNT V: VIOLATION OF HAWAII WHISTLEBLOWER'S PROTECTION ACT (EEOC #2)

181.   Plaintiff realleges and incorporates by reference paragraphs 1 through 180 as if said paragraphs were fully set forth herein.

182.   The above acts by Defendants with respect to Plaintiff constitute a violation of the Hawaii Whistleblower's Protection Act, Hawaii Revised Statutes Section 378-62.

183.   As a result of the aforementioned wrongful, unlawful, and illegal acts and/or omissions of Defendants as alleged herein, Plaintiff suffered special and general damages in an amount to be proven at trial.

WHEREFORE, Plaintiff respectfully prays for judgment in his favor and against Defendants jointly and severally, as follows:

A.      For general damages in amount to be shown at trial;

B.      For special damages in an amount to be shown at trial;

C.      For punitive and/or exemplary damages in an amount to be shown at

trial; and

D.      For attorneys' fees, costs, prejudgment and post-judgment interest

and such other and further relief both legal and equitable as the Court deems just

and necessary under the

circumstances.

DATED: Honolulu, Hawaii, June 8, 2022.

/s/Glenn H. Uesugi
MICHAEL JAY GREEN
GLENN H. UESUGI
Attorneys for Plaintiff
SUSANA R. CASAQUIT

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAII

| | | |
|---|---|---|
| SUSANA R. CASAQUIT, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| vs. | ) | |
| | ) | |
| HAWAII MEDICAL SERVICE | ) | |
| ASSOCIATION; AND DOE | ) | |
| DEFENDANTS 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable.

DATED: Honolulu, Hawaii, June 8, 2022.

> */s/Glenn H. Uesugi*
> MICHAEL JAY GREEN
> GLENN H. UESUGI
> Attorneys for Plaintiff
> SUSANA R. CASAQUIT